UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DONALD R. RYAN,                          )
                                         )
            Plaintiff,                   )
                                         )
      vs.                                )        Case No. 4:15-CV-1545 (CEJ)
                                         )
NANCY A. BERRYHILL[1],                   )
Acting Commissioner of Social Security,  )
                                         )
            Defendant.                   )

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social

Security Administration .  The Court has reviewed the parties' briefs and the entire

administrative record.

**I.   Procedural History**

On February 9, 2011, plaintiff filed an application for Supplementary Security

Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1385

with an alleged onset date of September 30, 1994. (Tr. 86-91).  The claim was

denied initially on April 11, 2011; thereafter the plaintiff timely filed a written

request for a hearing on May 4, 2011.  (Tr. 415).

The SSA granted plaintiff's request for review and an Administrative Law

Judge (ALJ) conducted a hearing on January 12, 2012.  (Tr. 10).  In a decision

dated February 6, 2012, the ALJ found that plaintiff was not disabled.  (Tr. 7).  On

June 14, 2012, the Social Security Administration Appeals Council (Appeals Council)

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the
Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W.
Colvin as the defendant in this suit.

denied plaintiff's request for review. (Tr. 424). On August 3, 2012, plaintiff filed a complaint with this Court alleging: (1) the ALJ decision was incorrect because there was no substantial evidence on the record to substantiate the ALJ's findings and (2) the decision was contrary to the provisions of the Social Security Act. (4:12-cv-1380-CEJ, Doc. #1, pg. 2). On February 11, 2013, this Court granted defendant's motion to reverse the decision of the ALJ and remanded the case for further evaluation of plaintiff's claim. (Tr. 429). On April 25, 2013, the Appeals Council vacated the February 6, 2012, ALJ order and remanded the case to an ALJ to further evaluate vocational evidence in support of its finding. (Tr. 432).

A second hearing was conducted on October 13, 2013, pursuant to the Appeals Council order. (Tr. 429). In a decision dated January 30, 2014, the ALJ found that plaintiff was not disabled. (Tr. 435). The ALJ subsequently vacated the decision on February 12, 2014, to allow the plaintiff to submit additional information. (Tr. 460). On February 28, 2014, after receiving the additional information, the ALJ again found that plaintiff was not disabled. (Tr. 316). On August 10, 2015, the Appeals Council reviewed the ALJ decision and concluded their final decision complied with the order of this Court. (Tr. 297). The Appeals Council noted that the decision was consistent with Social Security Administration regulations and supported by substantial evidence. (Tr. 297). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. **Evidence Before the ALJ**

### A. **Disability Application Documents**

On February 11, 2011, plaintiff applied for Supplemental Security Income under Title XVI of the Social Security Act, benefits under other programs

administered by the Social Security Administration, and medical assistance under Title XIX of the Social Security Act. (Tr. 86).  Plaintiff claimed a disability onset date of September 30, 1994.  (Tr. 86).

### 1. February 11, 2011 – Disability Report

In a Disability Report dated February 11, 2011, (Tr. 127-130) plaintiff described his prior disability filings and how he felt wronged by the ALJ who had denied his previous application.  (Tr. 129).

### 2. February 18, 2011 – Function Report

In a Function Report dated February 18, 2011, (Tr. 139-149), plaintiff stated that he had no permanent residence.  (Tr. 139).  In terms of relationships, plaintiff claimed that he had trouble getting along with family, friends, and neighbors because he lacks social skills, has a third grade education[2], and suffers from a learning disability, anxiety, and depression. (Tr. 144).  When asked whether his condition affects his sleep, plaintiff replied in the affirmative and explained that he cries and is depressed which results in limited sleep.  (Tr. 140).  When asked about his daily activities, plaintiff stated that he was depressed emotionally, and does nothing from the time he wakes up until going to bed.  (Tr. 139).  Plaintiff stated that he goes outdoors on a limited basis.  (Tr. 142).  Plaintiff attributed this to a lack of social skills and experiencing anxiety around crowds.  (Tr. 142).  When asked about his shopping habits, plaintiff stated that he goes to the store once a week and primarily purchases chips and soda.  (Tr. 142-143).

In terms of personal care, plaintiff's ability to dress, bathe, shave, and care for his hair were all impacted by low self-esteem.  (Tr. 140).  Plaintiff did not

---

[2] Plaintiff's educational records reflect the plaintiff attending high school until the tenth grade. (Tr. 561)

prepare his own meals and lacked an appetite.  (Tr. 140-141).  He had problems using the bathroom, which he attributed to being stressed and emotionally depressed.  (Tr. 140).  Plaintiff needed special reminders to take care of personal needs and grooming and to take medicine. (Tr. 141).  Plaintiff attributed these personal care issues to lack of energy, low self-esteem, emotional disturbance, and memory lapses he suffers due to his learning disability.  (Tr. 141).  Plaintiff also reported that he does not handle stress or changes in routine well.  (Tr. 145).

In terms of personal responsibilities, plaintiff stated that he is unable to do house or yard work because his balance is not stable, he fears getting hurt, and he lacks education and confidence.  (Tr. 142).  Plaintiff reported that he has no hobbies or interests because of anxiety, emotional distress, and loss of balance.  (Tr. 143).  Plaintiff's "limited" activities consisted of "helping with paperwork."  (Tr. 143).  Plaintiff stated that he is unable to pay bills, count change, handle a savings account, or use a checkbook which he attributes to a learning disability.  (Tr. 142).  Plaintiff also stated that he has a low IQ score and lacks of education.  (Tr. 142).

When asked how his condition affects him, plaintiff stated that he has trouble: lifting, squatting, bending, standing, walking, kneeling, talking, hearing, with memory, stair-climbing, using hands, completing tasks, concentrating, understanding, following instructions, and getting along with others.  (Tr. 144).  Plaintiff attributed all of these issues to his lack of social skills, lack of balance, hand injury, hearing loss, and poor education. (Tr. 144).  Plaintiff stated that he could only walk for one block before needing a rest, but could resume walking within fifteen minutes.  (Tr. 144).  Plaintiff stated that he walks with a cane because his balance is not always stable.  (Tr. 145).

Plaintiff stated that he does not get along well with authority figures because he lacks social skills and has anger issues. (Tr. 145). Plaintiff stated that he has been fired or laid off because of problems getting along with people because of his learning disability, lack of education, and lack of social skills. (Tr. 145). Plaintiff could not remember the name of the employer who fired or laid him off. (Tr. 145). Plaintiff also struggles following written instructions. (Tr. 144). When asked about unusual behavior or fears, plaintiff stated that he also believes he received an unfavorable decision on his previous disability application because the judge went out of his way to harm him physically. (Tr. 145).

### 3.    Fe<u>bruary 18, 2011 – Third-Party Function Report</u>

A Third-Party Function Report was completed by Linda McMenomy on February 18, 2011. (Tr. 131-138). McMenomy identified herself as a "lady from church" in defining her relationship to plaintiff. (Tr. 131). McMenomy stated that she sees plaintiff "from time to time" to assist with mail.

McMenomy described plaintiff as being depressed and suffering from anxiety and memory lapses. Because of depression and anxiety, plaintiff engaged in no activities during the day and had no hobbies or interests. He went outdoors only on a limited basis. McMenomy reported that plaintiff's conditions affected his sleep, appetite, and his ability to use the toilet and take care of his personal needs. She reported that plaintiff had to be reminded to take his medicine. She described plaintiff as lacking in self-esteem, motivation, and energy. McMenomy stated that plaintiff went shopping once a week to buy chips and soda. However, he became anxious when in a crowd. Plaintiff spent only a limited amount of time with other

people due to a lack of social skills and because of his anger, learning disability, depression, and anxiety.

McMenomy also stated that plaintiff is unable to pay bills, count change, handle a savings account, or use a checkbook because of his learning disability, low IQ score, lack of education and compensation. She reported that plaintiff uses a cane when becomes off-balance, although no doctor prescribed it for him. McMenomy stated that plaintiff has trouble lifting, squatting, bending, standing, walking, sitting, kneeling, talking, hearing, with memory, stair-climbing, using hands, completing tasks, concentrating, understanding, following instructions, and getting along with others. According to McMenomy, these issues stem from plaintiff's lack of social skills, lack of balance, hand injury, hearing loss and poor education. McMenomy reported that plaintiff does not get along with authority figures because he lacks social skills, cannot follow instructions, and is angry. McMenomy also stated that plaintiff has been fired or laid off from a job, which she attributed to difficulty working with people because of his learning disability, poor education, lack of social skills, and discomfort in crowds. McMenomy stated that since the denial of disability decision letter arrived, plaintiff has a high level of anger, anxiety, emotional distress, and believes the future looks grim due to the judge "basically making his funeral arrangements." (Tr. 137).

### 4. <u>April 27, 2011 – Function Report</u>

In a Disability Report dated April 27, 2011, plaintiff stated that since his previous Disability Report he began to suffer increased balance issues, worsening panic attacks, increased depression, lack of focus, and memory loss. (Tr. 158-165). Plaintiff also stated that he began to suffer headaches, anger issues, and a

lack of urgency. Plaintiff reported that he suffered from manic depression, paranoia, anxiety attacks, lower back pain, and had to use a cane to stay stable. Plaintiff also reported having suicidal thoughts. Plaintiff stated that he had been seeing a physician, Dr. Kamat, for four years to treat his mental condition, depression, anxiety, and panic attacks. Plaintiff noted that he had been prescribed Xanax and counseling. Plaintiff stated he also visited the Missouri Department of Social Services for a medical evaluation related to Medicaid coverage.

### 5.    Undated Disability Report

In an undated Disability Report, plaintiff stated that he had suffered two head injuries which resulted in hearing and memory loss, a loss of focus, a left hand injury, a learning disability, depression and fatigue. Plaintiff stated that he stopped working on January 1, 1994, because of his condition. In his last job he swept floors, mopped and emptied trash cans. Plaintiff stated that he had been in special education classes when he was in school.[3] Plaintiff also stated that he had been seeing Dr. Kamat for physical and mental conditions since 2008 and had been prescribed Alprazolam.

### B. January 12, 2012 Hearing.

At the hearing on January 12, 2012, plaintiff testified in response to questions posed by the ALJ and counsel. (Tr. 23). Plaintiff told the ALJ that he was 41 years old, 5'11" and weighed one-hundred and fifty pounds. (Tr. 24). Plaintiff stated that he was temporarily living with his brother; but received his mail at his parents' address. (Tr. 24). Plaintiff testified that he receives two hundred dollars a month in food stamps and has Medicaid. (Tr. 24-25).

---

[3] The educational records reflect that plaintiff attended high school. (Tr. 561)

Plaintiff stated that he was receiving medical treatment for psychiatric issues from Dr. Kamat, who diagnosed him with bipolar disorder and generalized anxiety disorder. (Tr. 25). Plaintiff testified that he was admitted to the hospital in July of 2011 because he was suicidal. (Tr. 25). Plaintiff stated that he has had suicidal ideation all of his life. (Tr. 31). Plaintiff also suffers from depression and a learning disability. (Tr. 25). When asked about medications, plaintiff testified that he was taking Abilify, Prozac, and Xanax, all prescribed by Dr. Kamat. (Tr. 25). Plaintiff stated that the medications make his legs weak and impact his mood by making him "not calm." (Tr. 32). Plaintiff confirmed that Dr. Kamat had diagnosed him with bipolar disorder and generalized anxiety disorder. (Tr. 25).

Plaintiff testified that he doesn't do well with social activities. (Tr. 26). In response to questions about his educational background, plaintiff stated that he was not a high school graduate and had been in special education classes since third grade. (Tr. 26). Plaintiff also testified that he did not have a GED nor did he have any specialized work training. (Tr. 33).

Plaintiff testified that he does not cook, unless he has a microwave. (Tr. 26). Plaintiff stated that he rarely goes to the grocery store, and if he does, it is to purchase a bag of chips or a soda. (Tr. 26). When asked about his personal hygiene, plaintiff testified that he is able to shower and clean himself regularly, but sometimes when he is depressed he does not regularly shower. (Tr. 27).

When asked about physical ailments, plaintiff testified that when he was either eighteen or nineteen years old he cut his left hand on a piece of glass which resulted in reduced grip strength and numbness on the inside of his hand. (Tr. 27-28). Plaintiff testified that he could not hold more than a gallon of milk with his left

hand because he suffers sharp, shooting pains through his fingertips. (Tr. 28). Plaintiff testified that he'd fractured his head in a fall from a roof when he was younger. He also testified that he'd been hit in the head with a baseball bat, which resulted in a complete loss of hearing in his right ear and a lengthy surgical scar. (Tr. 28-29).

Plaintiff testified that he has daily anxiety attacks and trouble sleeping. (Tr. 29-30). Plaintiff stated that he does not read the newspaper and has trouble with reading comprehension. (Tr. 32). Plaintiff testified that he spends most of his time during the day watching television if one is available. (Tr. 31). Plaintiff stated that he did not want any friends and avoids social situations. (Tr. 30). Plaintiff also testified that he has a driver's license but he does not drive. (Tr. 30).

During the day, plaintiff spent time with his brother and his pets but mostly watched television. (Tr. 30-32). Plaintiff stated that he had not worked in 16 years. (Tr. 33). Plaintiff testified that while he was working he had issues with management because "they knew something wasn't right" and he felt that management knew "that he wasn't as smart as they were." (Tr. 33). Plaintiff testified that he primarily worked doing janitorial work. (Tr. 34). Plaintiff testified that he does not have a bank account, and his sole income is from food stamps. (Tr. 32).

### C. October 13, 2013 Hearing

A second hearing was conducted on October 31, 2013, after the Court reversed the decision of the ALJ and remanded the case for further evaluation of plaintiff's claim. (Tr. 429).

### 1. Plaintiff's Testimony

At the hearing on October 13, 2013, plaintiff stated that he was 5'10" tall and weighed one-hundred and sixty pounds. He lived in an apartment with a female roommate. (Tr. 331). Plaintiff testified that had been in learning disabled classes for his entire life and that he reached the ninth grade. (Tr. 332). Plaintiff stated that he quit school because he was failing miserably. (Tr. 332).

When asked about activities he engages in, plaintiff testified that he has no hobbies or social activities and that he didn't do much on a normal day beside watch television. (Tr. 339). Plaintiff testified that in his previous jobs he was teased because of his disability. (Tr. 343). Those jobs ended because he either got fired or quit. (Tr. 343). Plaintiff also testified that he does not have access to a computer and has never used a computer. (Tr. 348).

Plaintiff testified that in September 2013 he had a seizure. (Tr. 336). Plaintiff stated that he had not had a seizure since. (Tr. 336). A doctor told him the seizure could occur again and prescribed medication. (Tr. 337). Plaintiff testified that he has no hearing in his right ear, he has trouble remembering things, and that he had occasional chest pains. . (Tr. 335, 337-338).

Plaintiff stated that he has been diagnosed with bipolar disorder which makes him unable to focus. (Tr. 335). Plaintiff explained that he cannot focus on a task for more than a half hour and that his thoughts are always racing. (Tr. 335-36). Plaintiff stated that he sleeps for four hours a night at most. (Tr. 336). Plaintiff also testified that he gets panic attacks in stressful situations. (Tr. 354).

Plaintiff stated that he was only able to lift up to 15 pounds with his left hand. (Tr. 332). He testified that he did not have any difficulty with sitting or standing, but noted that he had not walked for extended periods. (Tr. 332-333).

Plaintiff stated that he does not drive because he has seizures and did not have a car. (Tr. 333). When asked about personal hygiene, plaintiff stated that he needed to be reminded to shower but was able to dress himself. (Tr. 334). Plaintiff also stated that he does no cleaning, laundry, housework, or cooking around the apartment. (Tr. 334).

Plaintiff testified about an incident in which he was found on the side of the road and was taken to the hospital. (Tr. 344). Plaintiff stated that he had mixed up some medications which caused him to "fall out." (Tr. 345). Plaintiff testified that he was not sure what he was taking at the time. (Tr. 346). Plaintiff testified that he left against medical advice because he felt the hospital was "just letting [him] sleep it off" and he could do that at home. (Tr. 347).

## 2. <u>Vocational Expert Testimony</u>

A vocational expert, Denise Weaver, also testified before the ALJ. (Tr. 350). The ALJ posed a hypothetical to Weaver asking her to assume an individual with the same restrictions as plaintiff and determine whether there was any work available in the national economy for such an individual. (Tr. 351). Weaver testified that the individual could work as a cleaner in the hospital environment, a dining room attendant, or a kitchen helper. (Tr. 350-352).

Plaintiff's attorney expanded the hypothetical to include the assumption that the individual would also be ten percent off-task during the workday with a ten percent loss of productivity. (Tr. 352). Weaver stated that it is very possible, with ten percent off-task activity, that an employer would find, "in a probationary employee that that would not be acceptable." (Tr. 352). Plaintiff's attorney then added the limitation of needing two extra fifteen-minute breaks throughout the day

in addition to a lunch break and normal breaks through the day. (Tr. 352-353). The expert testified that the employer would need to make an accommodation, in the case of "a probationary employee in an unskilled setting," that would not be acceptable. (Tr. 353).

The ALJ posed an additional hypothetical to the expert, premised upon the original but adding with no intense interactions with other people, no tandem jobs performed, and with independent work. (Tr. 354-356). The vocational expert identified landscape specialist and stubber as additional jobs that the hypothetical individual could perform. (Tr. 356-358).

### D. Medical Records

### Sanjeev Kamat, M.D.

Dr. Sanjeev Kamat first evaluated plaintiff on October 2, 2007. (Tr.178). Plaintiff was 37 years old and presented for a psychiatric evaluation. (Tr. 178). For the previous 3-4 weeks plaintiff explained he had felt depressed and sad, which resulted in symptoms of feeling down, decreased engagement, fatigue, decreased appetite, and lack of concentration. (Tr. 178). Plaintiff denied any suicidal or homicidal ideations; as well as manic or psychotic symptoms. (Tr. 178). Plaintiff informed Dr. Kamat that he had previously been diagnosed with depression. (Tr. 178). Plaintiff stated that he had a previous hand injury and two head injuries, one at age nine and the other between the ages of twenty-three and twenty-four. (Tr. 180). Plaintiff stated his highest level of education was third grade. (Tr. 179).

On January 7, 2008, plaintiff told Dr. Kamat that he felt very anxious and had problems with feeling restless. (Tr. 183). Plaintiff denied feeling depressed and sad but stated that he worried a lot about various things. (Tr. 183). Plaintiff

stated that he had tried two medications prescribed by Dr. Kamat but they were not working. (Tr. 183). Dr. Kamat determined that plaintiff had generalized anxiety disorder and prescribed Xanax. (Tr. 183).

On February 18, 2008, plaintiff stated that he still felt anxious and had to take two Xanax pills at times. (Tr. 184). Plaintiff denied feeling depressed or hearing any voices. (Tr. 184). Dr. Kamat continued to prescribe Xanax. (Tr. 184).

On March 12, 2008, plaintiff stated that he felt better on his medication and had no problems concerning his mood. (Tr. 185). Plaintiff denied feeling anxious or depressed or feeling any paranoia. (Tr. 185). Dr. Kamat continued to prescribe Xanax. (Tr. 185).

From May 14, 2008 until January 5, 2011, plaintiff stated that he continued to feel better and was not feeling depressed, sad or anxious.[4] Plaintiff continued to note that he slept at night and denied hearing voices or experiencing paranoia.[5] Dr. Kamat continued to assess plaintiff as having generalized anxiety disorder and continued to prescribe plaintiff Xanax.[6]

On March 4, 2011, plaintiff stated he felt sad at times because his application for disability benefits had been rejected. (Tr. 234). However, plaintiff stated that he slept at night, had no feelings of paranoia and was not hearing voices. (Tr. 234). Dr. Kamat continued to prescribe Xanax. (Tr. 234).

---

[4] During this period plaintiff was seen by Dr. Kamat on the following occasions: (1) May 14, 2008 (Tr. 186), (2) June 18, 2008 (Tr. 187), (3) July 14, 2008 (Tr. 188), (4) September 9, 2008 (Tr. 189), (5) October 13, 2008 (Tr. 190), December 18, 2008 (Tr. 191), (6) February 12, 2009 (Tr. 192), (7) April 12, 2009 (Tr. 193), (8) January 25, 2010 (Tr. 228), (9) April 19, 2010 (Tr. 229), (10) June 14, 2010 (Tr. 230), (11) September 14, 2010 (Tr. 231), (12) November 9, 2010 (Tr. 232), and (13) January 5, 2011 (Tr. 233).
[5] *See supra n. 3*
[6] *See supra n. 3*

On May 1, 2011, plaintiff stated that he felt sad and depressed most times. (Tr. 292). Plaintiff also reported he had decreased energy at times and trouble focusing and concentrating. (Tr. 292). Plaintiff stated that he felt worthless and anxious at times, but that his medications helped with that. (Tr. 292). Dr. Kamat also assessed plaintiff as having major depressive disorder and prescribed Prozac as well as continuing to prescribe Xanax. (Tr. 292).

On July 27, 2011, plaintiff stated that he had episodes when he felt irritable, had racing thoughts, and would get easily distracted. (Tr. 293). Plaintiff stated that he was having trouble sleeping at night and often felt sad, depressed and anxious. (Tr. 293). Plaintiff stated that he had been admitted to St. Louis University Hospital for depression, anger, and suicidal ideation. (Tr. 293). Dr. Kamat assessed plaintiff as having major depressive disorder, generalized anxiety disorder, and ruled out bipolar affective disorder. (Tr. 293). Dr. Kamat prescribed Abilify, Prozac, and Xanax. (Tr. 293).

On August 31, 2011 and October 25, 2011, plaintiff reported that he felt better on his medications and denied feeling depressed. (Tr. 294-95). Plaintiff also reported that he slept well at night and had no major panic attacks. (Tr. 294-95). Plaintiff also stated that the Xanax helped his anxiety. (Tr. 294-95). Dr. Kamat assessed plaintiff as having generalized anxiety disorder and type 2 bipolar affective disorder. (Tr. 294-95). Dr. Kamat continued to prescribe Abilify, Prozac, and Xanax. (Tr. 294-95).

On December 20, 2011, plaintiff stated that he felt sad and depressed. (Tr. 296). Plaintiff explained he had decreased energy and trouble concentrating. (Tr.

296).  Plaintiff said he felt anxious at times.  (Tr. 296).  Plaintiff denied hearing voices and stated he was not feeling paranoid.  (Tr. 296).

On February 14, 2012, plaintiff stated that he felt sad and depressed at times and had been denied disability again.  (Tr. 569).  Plaintiff stated that he was not hearing voices and not feeling paranoid.  (Tr. 569).  Plaintiff stated that he slept "okay" at night.  (Tr. 569).

On April 10, 2012, plaintiff stated that he still felt sad and depressed at times.  (Tr. 570).  Plaintiff noted that his anxiety was under control with his medications.  (Tr. 570).

On July 11, 2012, plaintiff stated he was admitted at Phelps County Regional Medical Center for depression.  (Tr. 571).  Plaintiff stated that he was having a bad few days but felt better and was no longer depressed, sad, or anxious.  (Tr. 571). Plaintiff stated that he was not hearing voices and had no paranoia present.  (Tr. 571).  Plaintiff reported no difficulty sleeping at night.  (Tr. 571).

On August 29, 2012, plaintiff stated that he felt sad and depressed most days.  (Tr. 572).  Plaintiff noted that he was not sleeping well at night.  (Tr. 572). Plaintiff also stated that he was not paranoid or hearing voices.  (Tr. 572).  Dr. Kamat prescribed Abilify, Prozac, Xanax, and Ambien.  (Tr. 572).

On October 24, 2012, plaintiff said that he felt less depressed.  (Tr. 573).  He was not feeling anxious, hearing voices, or feeling paranoia.  (Tr. 573).  Plaintiff stated that he was able to sleep at night.  (Tr. 573).

On January 16, 2013, plaintiff stated that he was doing well on his current medications.  (Tr. 574).  Plaintiff reported he was not feeling depressed or anxious

and that he did not feel paranoid.  (Tr. 574).  Plaintiff stated that he was sleeping at night and not feeling irritable.  (Tr. 574).

On April 10, 2013, plaintiff stated he was having some panic attacks.  (Tr. 575).  Plaintiff stated he was not feeling sad or depressed.  (Tr. 575).  Plaintiff stated that he was not hearing voices and not feeling paranoia.  (Tr. 575).  Plaintiff stated that he was sleeping at night and had a fair appetite.  (Tr. 575).

On August 8, 2013, Dr. Kamat provided a Treating Source Statement.  (Tr. 616).  Dr. Kamat stated that plaintiff suffers from type 2 bipolar disorder and panic disorder and was currently on Prozac, Abilify, Ambien, and Alprazolam.  (Tr. 616).  Dr. Kamat stated that in his professional opinion, due to his diagnosis and symptoms of depression, irritability, panic attacks, and stress, plaintiff is disabled and unable to work and qualifies for disability.  (Tr. 616).

### Family Care Health Centers

On February 26, 2009, plaintiff was seen at Family Care Health Center by Robin Musselman, R.N.C.S.  (Tr. 202).  Plaintiff reported that he frequently had decreased mood and periods of anger, fatigue, hypersomnia, and lacked motivation.  (Tr. 202).  Plaintiff further reported that he was anxious throughout the day; he denied wanting to hurt himself or others.  (Tr. 202).  Plaintiff had complete range of motion to all extremities and equal muscle strength to upper and lower extremities.  (Tr. 202).

On May 26, 2009, plaintiff was again seen at Family Care Health Center.  (Tr. 199).  He stated that he had come because he was told that he needed a "regular doctor" in order to get a Medicaid card.  (Tr. 199).  Plaintiff also requested a statement that he was disabled and unable to work; his request was denied.

Plaintiff rejected offers to be seen by a doctor for evaluation of his cognitive ability and refused to have any lab work done.  Plaintiff was described as "somewhat hostile; but not threatening.".  (Tr. 199).

### Kyle DeVore, Ph.D.

On January 7, 2008, plaintiff was seen by Kyle DeVore, Ph.D. (Tr. 215).  Plaintiff stated that he felt anxious, restless, was experiencing palpitations, but denied feeling depressed or sad.  (Tr. 215).  On May 14, 2008, plaintiff stated that he continued to do well on his medications and denied feeling sadness, moodiness, or paranoia.  (Tr. 215).  On April 8, 2009, plaintiff stated that he felt fine, denied anxiety, or extreme worrying.  (Tr. 215).  Plaintiff also stated that he was not hearing voices and had not been experiencing paranoia.  (Tr. 215).

On August 12, 2009, Dr. DeVore determined that plaintiff had major depressive disorder.  (Tr. 208).  He also found that plaintiff had generalized anxiety disorder.  (Tr. 209).  Dr. DeVore concluded that plaintiff had a mild restriction of activities in daily living.  (Tr. 213).  He found that plaintiff had moderate difficulties in maintaining social functioning.  (Tr. 213).  He also found that plaintiff had mild difficulties in maintaining concentration, persistence, or pace.  (Tr. 213).  Dr. DeVore noted no degree of limitation in repeated episodes of decompensation.  (Tr. 213).  On August 12, 2009, Dr. DeVore concluded that the plaintiff retained the ability to perform simple, repetitive tasks in a limited social environment.  (Tr. 218).

### Raymond Leung, M.D.

On August 28, 2009, plaintiff was seen by Raymond Leung, M.D.  (Tr. 219).  Dr.  Leung noted that plaintiff had a history of head trauma and was completely

deaf in his right ear.  (Tr. 221).  He also noted that plaintiff had decreased long and short term memory.  (Tr. 221).  He further noted that plaintiff had weakened strength in his left hand and was unable to pick up a penny with his hands.  (Tr. 221).

## Lynne A. Meyers – Case Analysis

On March 30, 2011, Lynne A. Meyers performed a case analysis of plaintiff's medical records.  (Tr. 37).  Meyers reported that plaintiff was claiming a hearing impairment and a left hand injury. (Tr. 37).  Meyers found that plaintiff had diminished hearing in the right ear but not the left.  (Tr. 37).  She found  that plaintiff's allegations of severe disability and almost no daily activities were not credible because there was no medical documentation that was consistent with the allegations.  (Tr. 37).

## Keith L. Allen, Ph.D.

On April 8, 2011, plaintiff was seen by Keith L. Allen, Ph.D.  (Tr. 235-246). Dr. Allen stated that plaintiff was upset about being denied disability benefits.  (Tr. 245).  Based upon the preponderance of case file information, Dr. Allen found that, with treatment compliance, plaintiff had been stable and improved with no reported anxiety or depression.   (Tr. 245).   Plaintiff had no issues with understanding, coherency, concentrating, talking, or answering during the interview, except for anger about his previous denial of disability benefits.  (Tr. 671).  Plaintiff stated he had problems understanding, following instructions, getting along with others, memory, completing tasks, and with concentration.  (Tr. 671).  Dr.  Allen found this

inconsistent with the medical evidence. (Tr. 671). He noted that plaintiff was cooperative, behaved appropriately, spoke spontaneously, was cooperative and had logical thoughts. (Tr. 671). Dr. Allen concluded that based on the preponderance of case file information plaintiff was upset about being denied disability; however, the medical record indicated that with treatment compliance, plaintiff had been stable and improved with no reported anxiety or depression. (Tr. 671).

### 1.   St. Louis University Hospital

On July 7, 2011, plaintiff presented at the emergency room of Saint Louis University Hospital with complaints of anxiety, depression, and suicidal ideation. (Tr. 265). Plaintiff was seen by Dr. Michelle Greenberg. (Tr. 265). Plaintiff stated that he had planned to either hang or shoot himself. (Tr. 265). However, plaintiff also stated that he did not own or have access to a gun. (Tr. 280). Plaintiff stated that he was hearing voices telling him to hurt himself. (Tr. 265). Plaintiff also stated that he had been trying to get on disability and that he was "at the end of [his] rope." (Tr. 265). Plaintiff stated that he had felt hopeless and suicidal for his entire life, but was now feeling worse because his Xanax and Prozac were stolen six days prior. (Tr. 267). Plaintiff described his mood as bad; however his thought process was goal-oriented with no suicidal or homicidal ideations except a passive death wish. (Tr. 273). Plaintiff took an IQ test, which was found to be extremely low for a person who was communicating as properly as plaintiff. (Tr. 273). It was believed that the low IQ score was a result of malingering by plaintiff. (Tr. 273). Plaintiff was advised to call 911 or go to the nearest emergency room if he became suicidal or homicidal again. He was prescribed fluoxetine, hydroxyzine, and trazodone and was discharged on July 12, 2011. (Tr. 272-273).

**Mercy Clinic-Salem**

On July 31, 2012, plaintiff went to Mercy Clinic-Salem complaining of migraines and insomnia.  (Tr. 589).  Plaintiff also stated that he had issues with gastroesophageal reflux disease, abusive head trauma from when he was beaten with a baseball bat, a learning disability, anxiety, depression, and chronic bipolar affective disorder.  (Tr. 589).  Plaintiff was prescribed Zantac, Vistaril, Desyrel, Abilify, Prozac, Desyrel, Toprol XL, and Fioricet.  (Tr. 590-591).

On October 29, 2012, plaintiff went to the clinic again for a follow-up exam. He reported headache, insomnia, and depression.  (Tr.  597). Plaintiff was prescribed Toprol XL, and Desyrel.  (Tr. 597).

On July 15, 2013, plaintiff complained of depression.  (Tr. 588).  There is no medical evaluation in the record.

## 2.   **Salem Memorial Hospital**

On June 7, 2013, plaintiff was found on the side of the road by police.  (Tr. 578).  Plaintiff had filled a prescription for Xanax the previous day on June 6, 2013. (Tr. 578).  When plaintiff was found on June 7, 2013, there was only one Xanax pill remaining in the bottle.  (Tr. 578).  When observed at the hospital, plaintiff appeared confused, but also alert, awake, and well-developed.  (Tr. 580).  The hospital concluded that plaintiff overdosed on Xanax.  (Tr. 584).  Plaintiff stated that he was not suicidal.  (Tr. 584).

On September 19, 2013, plaintiff was found at home with complaints of hypertension and was brought to the emergency room.  (Tr. 617).  When found, plaintiff stated that he did not recall what had happened and that he woke up in the back of an ambulance.  (Tr. 621).   Greg Maynard, M.D.,  determined that plaintiff

had had a seizure in which he became unresponsive, his eyes rolled back in his head, and he stopped breathing. (Tr. 624). Plaintiff stated that he had been dizzy and sweaty since the morning. (Tr. 619). Examinations of plaintiff's head and chest determined he was clear of other issues. (Tr. 629-630). Plaintiff was discharged later that day. (Tr. 629).

On October 9, 2013, plaintiff was seen by Dr. Maynard for an issue concerning his mood. (Tr. 682). He was prescribed Lamictal. (Tr. 682).

On October 11, 2013, Dr. Maynard provided a Medical Source Statement. (Tr. 657). Dr. Maynard stated that plaintiff is not able to maintain gainful employment due to the degree of difficulty the plaintiff was having with irritability and anxiety, as well as his new diagnosis of seizure disorder. (Tr. 657). Dr. Maynard further stated that based on his medications and instability of medical problems, plaintiff would be a liability and recommended that plaintiff pursue disability. (Tr. 657).

### Sachin B. Thorat, M.D.

On October 10, 2013 plaintiff underwent an electroencephalogram (EEG) test to evaluate plaintiff's brain activities. (Tr. 653). Plaintiff had a normal awake EEG, which Dr. Thorat noted did not rule out epilepsy. (Tr. 653). Dr. Thorat suggested clinical correlation to corroborate his interpretation of the EEG test. (Tr. 653). Dr. Thorat prescribed plaintiff Lamictal. (Tr. 655).

### Mercy Hospital-Lebanon

On October 22, 2013, plaintiff was seen at Mercy Hospital-Lebanon for a sleep study. (Tr. 659). Plaintiff presented with a number of sleep-related issues,

including having trouble breathing while sleeping.  (Tr. 659).  He was diagnosed with obstructive sleep apnea.  (Tr. 660).

### **Thomas J. Spencer**

On December 13, 2013, plaintiff was seen by Thomas J. Spencer, for a psychological evaluation to assist in the determination of eligibility for disability benefits.  (Tr. 686).  Plaintiff's primary complaint was that he had a learning disability.  (Tr. 686).  Spencer noted plaintiff obtained an IQ score of 46; however Spencer did not consider that to be an accurate representation of plaintiff's present functioning after speaking with him and reviewing the available records.  (Tr. 688-689).

Spencer provided a Medical Source Statement pertaining to plaintiff's ability to do work-related activities on a sustained basis.  (Tr. 690).  Spencer determined that plaintiff had mild restrictions in terms of understanding and remembering simple instructions and carrying out simple instructions.  (Tr. 690).  Spencer further determined that plaintiff had moderate restrictions in terms of making judgment on simple and complex work-related decisions, understanding and remembering complex instructions and carrying out complex instructions.  (Tr. 690).  Spencer determined that plaintiff had mild restrictions in interacting appropriately with the public, supervisor(s), and co-workers.  (Tr. 691).  Spencer found that plaintiff had a moderate restriction in responding appropriately to usual work situations and changes in a routine work setting.  (Tr. 691).

### **E.  Educational Records**

Plaintiff was classified as needing special education in 1978.  (Tr. 560).  Educational records show that plaintiff consistently tested in the bottom quintile in

fifth and sixth grade on the Cognitive Abilities Test (CogAT). (Tr. 559). In 1982, plaintiff scored in the third percentile based upon age and seventh percentile based upon grade for verbal skills, in the sixth percentile based upon age and fourteenth percentile based upon grade for quantitative skills, in the eleventh percentile based upon age and nineteenth percentile based upon grade for nonverbal skills. (Tr. 559). In 1983, plaintiff scored in the eleventh percentile based upon age and seventeenth percentile based upon grade for verbal skills, in the fifth percentile based upon age and eighth percentile based upon grade for quantitative skills, and in the third percentile based upon age and fourth percentile based upon grade for nonverbal skills. (Tr. 559). Plaintiff attended Roosevelt High School through the end of the tenth grade with a cumulative 0.5 GPA. (Tr. 561).

## III. **The ALJ's Decision**

### A. **February 6, 2012**

In the decision issued on February 6, 2012, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits:

1. The plaintiff has not engaged in substantial gainful activity since February 11, 2011, the application date.

2. The plaintiff has the following severe impairments: a bipolar affective disorder and anxiety disorder.

3. The plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he is restricted to the performance of simple, routine, and repetitive work tasks.

5. Plaintiff has no relevant work.

6. Plaintiff was born on July 13, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has a limited 10th grade education and is able to communicate in English.

8. Transferability of job skills is not an issue because the plaintiff does not have past relevant work.

9. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The plaintiff has not been under a disability, as defined in the Social Security Act, since February 11, 2011, the date the application was filed.

(Tr. 7-20).

## B. **February 28, 2014**

In the decision issued on February 28, 2014, the ALJ made the following findings with respect to plaintiff's application for disability insurance benefits:

1. The plaintiff has not engaged in substantial gainful activity since February 9, 2011, the application date.

2. The plaintiff has the following severe impairments: bipolar disorder type 2 and panic disorder.

3. The plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can understand, remember and carry out simple instructions consistent with unskilled work; he can work within a low-stress environment where there are no strict production quotas and where he will not be subject to the demands of fast-paced production work, he can perform simple decision making related to basic work functions; and he can tolerate only minor, infrequent changes within the workplace.

5. Plaintiff has no relevant work.

6. Plaintiff was born on July 13, 1970 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has a limited education and is able to communicate in English.

8. Transferability of job skills is not an issue because the plaintiff does not have past relevant work.

9. Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The plaintiff has not been under a disability, as defined in the Social Security Act, since February 9, 2011, the date the application was filed.

(Tr. 301-322).

## IV.    **Legal Standards**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the plaintiff was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "'Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a plaintiff must prove that he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir.

2009). "Each step in the disability determination entails a separate analysis and legal standard." *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three requires the plaintiff to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. *Pate-Fires*, 564 F.3d at 942. If the plaintiff does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. *Id.*

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] plaintiff's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a plaintiff's RFC, the ALJ must evaluate the plaintiff's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the plaintiff's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional

restrictions; (6) the plaintiff's work history; and (7) the absence of objective medical evidence to support the plaintiff's complaints." *Buckner*, at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a plaintiff's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the plaintiff's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059–60 (8th Cir. 1998).

At step four, the ALJ determines whether a plaintiff can return to his past relevant work, by comparing the RFC with the physical and mental demands of a plaintiff's past work. 20 C.F.R. § 404.1520(f). The burden at step four remains with the plaintiff to prove her RFC and establish that he cannot return to his past relevant work. *Moore*, 572 F.3d at 523; accord *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a plaintiff cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the plaintiff maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the plaintiff is prevented by his impairment from doing any other work, the ALJ will find the plaintiff to be disabled.

## V.  **Discussion**

Plaintiff raises the following issues in this matter: (1) whether the ALJ erred in the credibility analysis and (2) whether the ALJ erred in determining plaintiff's mental limitations.

### A.  **Mental Impairments**

Plaintiff argues that the ALJ committed a reversible error by failing to give great weight to the opinions of Drs. Kamat and Maynard.  Each doctor's opinion will be addressed in turn.

According to 20 C.F.R. § 404.1527(c) an ALJ will consider several factors to decide the weight that should be afforded to a medical opinion, including the (1) examining relationship, (2) length of the treatment relationship and frequency of examination, (3) nature and extent of the treatment relationship, (4) supportability of the opinion, (5) consistency with the record as a whole, (6) specialization of the expert, and (7) any other factors brought to the ALJ's attention. 20 C.F.R. § 404.1527(c)(1)-(6).

A treating physician's opinion on the "nature and severity" of the impairments will receive controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2); *see also Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005). Part and parcel to this analysis is whether the treating physician's opinion is internally inconsistent –

"[w]hen a treating physician's notes are inconsistent with his or her residual functional capacity assessment, we decline to give controlling weight to the residual functional capacity assessment." *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007); *see also Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009) (discrediting a treating physician's opinion that was inconsistent with his treatment records). Therefore, "[a]lthough a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

Plaintiff argues that the ALJ committed reversible error by failing to give great weight to Dr. Kamat's opinion. Dr. Kamat opined that plaintiff was unable to work due to his symptoms of depression, anxiety, and panic attacks. (Tr. 616). The ALJ was entitled to not give controlling weight to Dr. Kamat's opinion because it involves an issue reserved for the Commissioner and therefore is not the type of medical opinion to which the Commissioner gives controlling weight. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (finding that a medical source opinion that an applicant is disabled or unable to work involves an issue reserved for the Commissioner of Social Security and therefore is not the type of medical opinion to which the Commissioner gives controlling weight). The ALJ noted that Dr. Kamat's own records showed numerous normal mental status examinations of the claimant, which were inconsistent with Dr. Kamat's subsequent opinion. (Tr. 313, 616). Courts are obligated to give controlling weight to the opinion of a treating physician, if it is not inconsistent with the other substantial evidence. *Michel v. Colvin*, 640 F. App'x 585, 597 (8th Cir. 2016); *see also Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir. 2014) (holding that even a treating source does not receive

controlling weight if the source's opinions are inconsistent, or inconsistent with other substantial evidence in the record).

Upon reviewing Dr. Kamat's treatment records, the Court finds that the decision of the ALJ to not give controlling weight to Dr. Kamat is supported by substantial evidence on the record. (Tr. 287-296, 313, 568-575). During plaintiff's previous visits to Dr. Kamat, it was noted that plaintiff was feeling less depressed on his current medications. (Tr. 573-575). On April 10, 2013, Dr. Kamat did note that plaintiff was having panic attacks; however that was the only symptom presented since August 29, 2012. (Tr. 572, 575). The notes provided by Dr. Kamat are inconsistent with his stated opinion that plaintiff was unable to work due to his symptoms of depression, irritability, panic attacks and stress. Further, Dr. Kamat's notes are consistent with the rest of the record; it is his proffered opinion which is inconsistent and fails to support his determination of a disability such that plaintiff is unable to work. The Court finds that substantial evidence supports the ALJ's determination to assign little weight to the opinion of Dr. Kamat.

Plaintiff also argues that the ALJ improperly gave little weight to the opinion of Dr. Maynard. Dr. Maynard opined that plaintiff was unable to maintain gainful employment due to the degree of difficulty plaintiff has with irritability and anxiety, and his diagnosis of seizure disorder. (Tr. 657). A treating physician's opinion is normally entitled to great weight, but such an opinion does not automatically control, since the record must be evaluated as a whole." *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

The ALJ stated that little weight was given to the opinion of Dr. Maynard because his opinion was not well supported or consistent with the evidence. Dr.

Maynard opined that plaintiff was not able to maintain gainful employment due to the degree of difficulty he was having with irritability and anxiety, which required an adjustment of medications, in addition to his diagnosis of seizure disorder. (Tr. 657). The ALJ stated that Dr. Maynard's treatment records do not reflect any psychiatric symptoms or functional limitations. (Tr. 313). The treatment records show seizure medication was prescribed to plaintiff, but also show plaintiff had a normal EEG, no seizure activity, and no reported side effects from the seizure medication. (Tr. 313). The medical evidence on record from Dr. Maynard does not present any psychological symptoms or functional limitations. (Tr. 682-685). Plaintiff claims this is inaccurate because plaintiff was diagnosed with depression and received medication for insomnia. However, the medical records do not show how those diagnoses demonstrate any psychological symptoms or functional limitations. Dr. Maynard's records state that plaintiff was seen for a "mood problem," but provide no detail as to what plaintiff's psychological symptoms or functional limitations actually are. (Tr. 682). The record does not contain an assessment of plaintiff; only a breakdown of the medication prescribed. (Tr. 682). While Dr. Maynard reports that plaintiff suffered a seizure, no evidence was presented that plaintiff had been diagnosed with a seizure disorder. (Tr. 684). Both Dr. Maynard and Dr. Thorat found plaintiff to have a normal awake EEG. (Tr. 653, 684). Neither doctor diagnosed plaintiff with any disease in their records, however neither doctor ruled out epilepsy. (Tr. 653, 684). If a treating source "renders inconsistent opinions that undermine the credibility of such opinions," the treating source's opinion may be discounted or disregarded. *Blackburn v. Colvin*, 761 F.3d 853, 860 (8th Cir.2014). Dr. Maynard's opinion is inconsistent with his

own medical records, and the overall evidence of the record. Further, Dr. Maynard's opinion is inconsistent with the results of the more recent, December 13, 2013 psychological testing and evaluation done by Thomas J. Spencer, whose opinion the ALJ gave "great weight." (Tr. 686). When the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011). The Court finds substantial evidence in the record to support the ALJ's determination to assign little weight to the opinion of Dr. Maynard.

### B. **Mental Limitations**

Plaintiff next contends that the ALJ committed reversible error by failing to find that plaintiff had a severe impairment related to his learning disability and cognitive disorder. The ALJ did find that plaintiff had a severe impairment related to his cognitive disorder. However, the ALJ determined that the impairment, while severe, was not severe enough to equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

Plaintiff argues that there is a multitude of evidence that a cognitive disorder/learning disability exists and that Dr. Maynard indicated that the impairment is severe. Plaintiff points to medical records showing a prior traumatic brain injury and poor cognitive function, as well as being in special education and performing poorly while in school.

The ALJ specifically stated that the plaintiff's type 2 bipolar disorder and panic disorder were severe impairments. (Tr. 307). The ALJ stated that she considered those impairments to be more than slight abnormalities which have

more than a minimal effect on the plaintiff's ability to perform basic work activities. (Tr. 307). The ALJ took into account these impairments in determining plaintiff's residual functional capacity. Plaintiff cites *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir. 1989), to argue that the ALJ did not have sufficient evidence for this determination. In *Easter*, the 8th Circuit found that the ALJ erred by failing to fully consider the medical record. *Id.* at 1130-31. Here, the ALJ cited substantial evidence from the record in their opinion and reviewed each physician's treatment records in making their determination. The ALJ noted that the record provided evidence that plaintiff's fund of knowledge appeared normal, and that on two occasions examiners invalidated intelligence quotient test on the basis of the claimant providing false response. (Tr. 308). The ALJ also noted that while there is evidence of failing grades in high school and a special education designation in elementary school; there is no evidence of an individual education plan or special education classes. (Tr. 308).

"The claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (citing *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir.2004)). Here, plaintiff has not provided any medical evidence in the record demonstrating a learning disability diagnosis. Further, when assessing a disability benefits application, even the fact that a party has a learning disability or cognitive disorder does not mean that the party has a severe impairment. *Buckner v. Astrue*, 646 F.3d 549, 557 (8th Cir. 2011). Each of the issues plaintiff presents are ones that the ALJ addresses in his opinion with substantial supporting evidence. If two inconsistent positions can be drawn from the evidence, and one of those

positions represents the ALJ's decision, it will be affirmed. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir.2011). The ALJ took into account the medical evidence in accounting for plaintiff's limitations in the residual functional capacity determination. (Tr. 309).

*   *   *   *   *

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed.**

A separate judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2017.